UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ELLEN T. THATCHER,

        Plaintiff,

v.                                    Case No. 8:17-cv-3061-T-AEP

DEPARTMENT OF VETERANS AFFAIRS,

        Defendant.

_____/

## ORDER

Plaintiff Ellen T. Thatcher ("Thatcher") brought this action asserting claims against the Department of Veterans Affairs (the "VA") for violations of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (the "Rehabilitation Act") (Doc. 13).  Currently before the Court is the VA's Motion for Summary Judgment (Doc. 41), in which the VA argues that summary judgment should be granted as Thatcher failed to demonstrate that the VA discriminated or retaliated against her based on her disability.   Namely, the VA argues that, under the burden-shifting analysis, Thatcher failed to establish her *prima facie* case or to establish that the VA's legitimate, nondiscriminatory and nonretaliatory reasons for its actions constituted pretext for disability discrimination or retaliation.  Thatcher responds in opposition, asserting that the facts demonstrate that the VA failed to engage in an interactive process with her, discriminated against her, and retaliated against her based on her disability (Doc. 61).  The VA subsequently filed a reply brief, disputing Thatcher's arguments and assertions (Doc. 65).  For the following reasons, the VA's Motion for Summary Judgment (Doc. 41) is granted.[1]

---

[1]  The parties consented to the undersigned's jurisdiction (Docs. 29 & 30).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; M.D. Fla. R. 6.05.

### I.      Background

Thatcher served in active duty in the United States Army from 1982 to 1986 (Doc. 41, Ex. A).  Subsequently, Thatcher began working as a licensed practical nurse at the Bay Pines VA Healthcare System (the "Bay Pines VA") in 1992 and then as an Advanced Registered Nurse Practitioner ("ARNP") at the Bay Pines VA from 2000 until her disability retirement on July 14, 2014 (Doc. 42, Deposition of Ellen T. Thatcher ("Thatcher Dep."), at 7-10).  Initially, Thatcher worked in the Community Living Center, where she worked alongside Dr. Leonard Williams ("Dr. Williams"), with whom she experienced what she classified as a "little discord" and "harassment" starting around 2005 (Thatcher Dep., at 10-14, 16-18, 91, 146-48; Doc. 48, December 18, 2014 Deposition of Dr. Leonard Williams ("2014 Williams Dep."), at 12-14; Doc. 49, May 10, 2019 Deposition of Dr. Leonard Williams ("2019 Williams Dep."), at 16-22). Thatcher later transitioned to the in-patient hospice unit around 2007 and then, around 2011, Thatcher became the Home Hospice Coordinator for the Geriatrics and Extended Care Service ("Geriatrics") (Thatcher Dep., at 9-10).

Dr. Williams became the Chief of Geriatrics at the Bay Pines VA in 2011 and functioned in dual positions as Chief of Geriatrics and Medical Director starting in 2014 (2014 Williams Dep., at 4-5, 14; 2019 Williams Dep., at 8-14).  Following a reorganization, Dr. Williams became Thatcher's supervisor around February 2012 (2019 Williams Dep., at 23-24; Doc. 61, Ex. 33, at ¶4).  From 2009 through 2012, Thatcher received performance reviews indicating that she performed either at a high satisfactory or outstanding level, including Dr. Williams's performance review of Thatcher in 2012 (Doc. 61, Ex. 1-4).  She also received a Shining Star Award in late 2011 or early 2012 for her work with hospice patients (Thatcher Dep., at 24-25). By the time Dr. Williams became Thatcher's supervisor, however, Thatcher felt that Dr. Williams demonstrated long-standing personal issues with her dating back several years and

believed he even held a "vendetta" against her for a variety of reasons (Thatcher Dep., at 12-14, 16-18, 27-28, 30-31, 38-39, 53-58, 91, 146-48; 2019 Williams Dep., at 16-22; Doc. 41, Ex. KK, at 23-24, 62-64; *see* Doc. 61, Ex. 15, 30, 32, 33, 34).   Thatcher also believed that several other individuals at the Bay Pines VA wanted to "get rid" of her at that time, as she felt hostility from coworkers and believed she was excluded from meetings, which she indicated also continued after her return from back surgery (Thatcher Dep., at 19-21, 26-31; Doc. 41, Ex. D, E, F; Doc. 61, Ex. 30, August 12, 2019 Affidavit of Ellen Tracy Thatcher ("2019 Thatcher Aff."), at ¶¶7-8).

Dr. Dominique Thuriere ("Dr. Thuriere") was the Chief of Staff for Mental Health and Behavioral Sciences at the Bay Pines VA in 2013, which included responsibility for Geriatrics (Doc. 47, Deposition of Dr. Dominique Thuriere ("Thuriere Dep."), at 5-6, 45).   In April 2013, given issues with productivity, overspending, and costs in Geriatrics, the Director of the Bay Pines VA ordered a "deep dive" as to the Hospice and Palliative Care Unit (the "Hospice Unit") (2014 Williams Dep., at 19-22; 2019 Williams Dep., at 36-37; Doc. 61-8 Deposition of Elizabeth K. Whidden ("Whidden Dep.), at 27-28).   Following the deep dive, Geriatrics, consisting of the Hospice Unit, the Palliative Care Consult Team, Home Hospice, and Bereavement, was restructured (Whidden Dep., at 53-54).   Namely, upon review, a determination was made that two nurses in the Home Hospice were improperly placed in bereavement roles outside the scope of the practice of the nurses and that Thatcher, as an ARNP, was being underutilized as she was not working within her skills, abilities, and licensures in her liaison role of Home Hospice Coordinator (2014 Williams Dep., at 19-24; 2019 Williams Dep., at 36-39; Whidden Dep., at 10-14, 53-54; Doc. 61-9, February 3, 2015 Deposition of Joan Correira ("2015 Correira Dep."), at 27-28).   Instead, the Home Hospice Coordinator position should have been held by a social worker or licensed practical nurse (2014 Williams Dep., at

22-24; 2019 Williams Dep., at 36).  Accordingly, Dr. Thuriere informed Dr. Williams that Thatcher, as an ARNP, needed to perform the duties of an ARNP within Geriatrics (2014 Williams Dep., at 24; 2019 Williams Dep., at 47-48).  As a result, Dr. Williams met with Thatcher prior to her medical leave to explain to Thatcher that she needed to practice in a position using her abilities, skills, and licensure as an ARNP and would be moved from her liaison position as the Home Hospice Coordinator to a third palliative care nurse practitioner position within the Hospice Unit (2014 Williams Dep., at 24-26; 2019 Williams Dep., at 46-47; Whidden Dep., at 14-16; 2019 Thatcher Aff., at ¶9).  As explained to Thatcher, the plan involved keeping her as the Home Hospice Coordinator until she left for her medical leave, having her train at least two other people on how to perform the Home Hospice Coordinator duties before she went on medical leave, and then immediately transitioning her into clinical work as a palliative care ARNP in the Hospice Unit upon her return from medical leave (2014 Williams Dep., at 25-27; 2019 Williams Dep., at 46-48).  Upon Thatcher's return, the plan involved phasing Thatcher in slowly, given that she had been out of clinical work for a long period of time (2019 Williams Dep., at 104-06).

According to Dr. Williams, the union needed to be notified about why Thatcher was no longer able to stay in her Home Hospice Coordinator position and to be notified that Thatcher had been informed of the decision to change her position (2019 Williams Dep., at 48, 52-53). Dr. Williams and Ronald Plemmons, an Employee and Labor Relations Specialist in HR at the Bay Pines VA, therefore prepared a draft letter for Thatcher detailing the information required to satisfy the union, but Dr. Williams informed Thatcher that she could make changes or additions to the letter as she liked (2019 Williams Dep., at 48, 51-53 & Ex. 4).  The prepared letter echoed the information that Dr. Williams informed Thatcher of previously, including that the basis for the change in position stemmed from the fact that the Home Hospice Coordinator

position did not require the level of an ARNP and that Thatcher therefore worked in a role below her abilities, skills, and licensure in that position (2019 Williams Dep., Ex. 4).  Thatcher did not sign the draft letter, as she found the letter derogatory and demeaning, but rather prepared her own letter and submitted it on August 12, 2013 (Thatcher Dep., at 26; 2019 Williams Dep., at 52-53; Doc. 41, Ex. D, E, & DD, Attachment 1).[2]

Prior to that, in June 2013, Thatcher took eight weeks of medical leave for neck surgery followed by immediate back surgery, consisting of discectomies of C4 through C7 and L5 through S1, within days of one another (Thatcher Dep., at 22; Doc. 41, Ex. N, O).   At the end of July 2013, upon her return from medical leave, Thatcher began working part-time as a nurse practitioner in the Hospice Unit (2019 Williams Dep., at 53-55; Doc. 41, Ex. O).  On August 8, 2013, Thatcher wrote a letter to all Service Chiefs at Bay Pines regarding the excellent care she received and indicating that Dr. Williams had been supportive, understanding, and given Thatcher the time she needed to heal and recover (Doc. 41, Ex. C).  She added further that the entire Geriatrics team had been flexible with a high degree of integrity and that she deeply appreciated their "never-ending support and understanding" as she recovered (Doc. 41, Ex. C).

Thatcher continued her work in the Hospice Unit and began working full-time with no restrictions on August 12, 2013 (2019 Williams Dep., at 55).  Notwithstanding her August 8, 2013 letter, during the week of August 12, 2013, Thatcher believed that she continued to be excluded from meetings, she felt disrespected, and she was told that the Nurse Manager Beth Whidden ("Whidden"), Nurse Practitioner Joann Correira ("Correira"), and Social Worker Niki

---

[2]  Later, in an August 16, 2013 e-mail, Thatcher thanked Dr. Williams for apologizing about the initial letter and allowing her to submit her revised letter to HR, as it was a "show of support" from Dr. Williams (Doc. 41, Ex. E).  She further indicated that she believed Dr. Williams was misled and urged to compose the original letter (Doc. 41, Ex. E).

Knipper ("Knipper")[3] held discussions about getting rid of her and demonstrated hostility toward her (Thatcher Dep., at 19-21, 26-30; Doc. 41, Ex. B, D, E, F).  To that end, Thatcher submitted a Report of Contact[4] regarding behavior Thatcher perceived as disrespectful from Whidden, Correira, and Knipper and then sent an e-mail to Dr. Williams detailing how members in the Hospice Unit continued to show her disrespect and were engaging in a "witch hunt" against her (Doc. 41 Ex. D & E)

On August 15, 2013, an incident occurred between Thatcher, Correira, and Dr. Brenda Krygowski ("Dr. Krygowski"), a hospice palliative care physician and acting Medical Director for the Hospice Unit, during which Dr. Krygowski felt that Thatcher acted improperly, created a hostile work environment, and engaged in inappropriate touching (Doc. 41, Ex. E, F, G, H; Doc. 61-7, December 17, 2014 Deposition of Dr. Brenda Krygowski ("2014 Krygowski Dep.), at 11-12, 21-40; Doc. 61-11, April 22, 2019 Deposition of Dr. Brenda Krygowski ("2019 Krygowski Dep.), at 12-14, 17-22, 29-45, 49-50; 2014 Williams Dep., at 37).[5]  Following the incident, Dr. Krygowski and Correira each submitted a Report of Conduct regarding the incident, and Dr. Krygowski also reported her concerns directly to Dr. Williams (2019 Krygowski Dep., at 41, 45-46; 2014 Williams Dep., at 51-53; 2019 Williams Dep., at 59-60; Doc. 41, Ex. G & H).  After discussing the incident with Dr. Krygowski, Dr. Williams discussed the matter directly with Dr. Thuriere (2014 Williams Dep., at 51-54, 59; 2019 Williams Dep., at 71-72).  Dr. Thuriere informed Dr. Williams that a fact finding, or investigation, needed to occur (2014 Williams Dep., at 53-54; Thuriere Dep., at 17-19).  Given the allegations of a

---

[3]  Though spelled "Kipper" in the Report of Contact, it appears from the record that the proper last name is "Knipper" (*see, e.g.,* Thatcher Dep., at 15)

[4]  Dr. Williams described a Report of Contact as a document "putting in writing the facts, as you see them" (2014 Williams Dep., at 60).

[5]  Dr. Krygowski described three incidents on August 15, 2013, but the main incident of note is the one described herein (2014 Krygowski Dep., at 17-56).

hostile work environment and inappropriate touching, which Dr. Thuriere believed could be construed as an assault, Dr. Thuriere advised Dr. Williams that the Bay Pines VA Police should be notified so that they could follow their policies and processes (Thuriere Dep., at 19; Doc. 41, Ex. F).  Dr. Thuriere also indicated that Thatcher needed to be removed, given the nature of the allegation, and directed Dr. Williams to temporarily transfer Thatcher to the Largo office to avoid further contact between Thatcher and Dr. Krygowski, as the alleged perpetrator and the alleged victim of misconduct (2014 Williams Dep., at 53-54; 2019 Williams Dep., at 55-57, 73).  At that time, the Largo office constituted the most appropriate place for relocation because Thatcher could remain separated from Dr. Krygowski and because Geriatrics had space and duties Thatcher could perform at that location (Doc. 41, Ex. I, at 49-52).

In an August 16, 2013 memo to Cecil Johnson ("Johnson"), Chief of Employee Relations in HR, Dr. Williams memorialized the events of August 15, 2013 and other concerns regarding Thatcher and requested assistance with the fact finding and possible decision to detail Thatcher elsewhere (Doc. 41, Ex. F; Doc. 44, December 18, 2014 Deposition of Cecil Johnson ("2014 Johnson Dep."), at 4, 9-10).  Dr. Williams recused himself from the fact finding, given the subject matter of the investigation, comments made by Thatcher regarding Dr. Williams, and the personal and working relationship between his son and Thatcher's ex-husband (2014 Williams Dep., at 54-55; Doc. 41, Ex. F).  On the same day, Dr. Williams issued a memo to Thatcher informing her of concerns related to possible misconduct by her, which formed the basis for the decision to temporarily reassign her to the Largo office, effective immediately, pending the outcome of an investigation and any subsequent administrative action (Doc. 41, Ex. J).  Notably, Dr. Williams indicated that her current position (title, series, and grade) would remain the same (Doc. 41, Ex. J).  In a meeting that day with Thatcher, the union, and HR, Dr.

Williams read Thatcher the memo and explained what would transpire thereafter (2014 Williams Dep., at 61).

Shortly thereafter, on August 20, 2013, Dr. Krygowski contacted the Bay Pines VA Police regarding the August 15, 2013 incident (Doc. 61, Ex. 14).  Following the incident, Dr. Krygowski indicated that she feared Thatcher and, after discussing the matter with her husband, they decided that Dr. Krygowski should file a police report to ensure her protection, which she explained to Dr. Williams and he supported (2014 Krygowski Dep., at 47-58; 2019 Krygowski Dep., at 51; 2014 Williams Dep., at 68-70; 2019 Williams Dep., at 97-99).  In the Investigative Report issued by the Bay Pines VA Police, the investigating officer indicated that Dr. Krygowski relayed her version of the events of August 15, 2013 and both Dr. Krygowski and Correira provided voluntary witness statements (Doc. 61, Ex. 14).  The investigating officer noted that, though Dr. Krygowski initially expressed concern for her safety as a result of Thatcher's actions, as of August 30, 2013, no further issues occurred with Thatcher, as Thatcher had been detailed to the Largo office, and that administrative action would proceed (Doc. 61, Ex. 14).  Given the administrative action, no criminal charges would be pursued, and the case would be closed with no further police action (Doc. 61, Ex. 14).

Prior to that, on August 19, 2013, Dr. Angel Cruz, Plaintiff's VA neurologist who did not perform her double surgery, provided a medical statement regarding Thatcher's medical condition (Doc. 41, Ex. M; Doc. 43, Deposition of Dr. Angel Cruz ("Cruz Dep."), at 5-12).  Dr. Cruz indicated that Plaintiff's symptoms worsened by driving more than five miles and therefore recommended that she limit her physical activities to a minimum, including driving, until her next evaluation on August 26, 2013 with her neurosurgeon (Doc. 41, Ex. M; Cruz Dep., at 5-12).  On August 26, 2013, Dr. Robert Kowalski, Thatcher's neurosurgeon, indicated that Thatcher could continue to work with some restrictions (Doc. 41, Ex. N).  Namely,

Thatcher must have a limited commute, *i.e.* less than 15 minutes, as a driver or passenger; she must be able to change positions every 15 minutes or so; and standing and sitting should be limited to 15-minute stretches with a change of position (Doc. 41, Ex. N).   Dr. Kowalski also directed Thatcher to follow up with him in six weeks to reassess her progress (Doc. 41, Ex. N).

At or around August 26, 2013, Johnson received Dr. Cruz's medical statement regarding Thatcher's condition and met with Thatcher (Doc. 41, Ex. M; 2014 Johnson Dep., at 27-28; Doc. 45, April 23, 2019 Deposition of Cecil Johnson ("2019 Johnson Dep."), at 23-26; Thatcher Dep., at 100-01, 109).  During the meeting, Thatcher informed Johnson that she had medical restrictions regarding the length of time she could drive between home and work, indicating that she could drive no more than 15 minutes (2014 Johnson Dep., at 28-29).   In response, Johnson described a way that he believed she could get to and from her job with the restriction, stating that, if she could not drive more than 15 minutes, she could leave her home a little earlier, drive 15 minutes, stop, take a break to get out of the car and walk around, get back in her car, drive another 15 minutes, and take another break if needed (2014 Johnson Dep., at 29; 2019 Johnson Dep., at 11).

Though Thatcher believed that Johnson knew she requested a reasonable accommodation when she presented Dr. Cruz's medical statement, Johnson stated that he did not understand his conversation with Thatcher to constitute a request for a reasonable accommodation (2014 Johnson Dep., at 30-31; 2019 Johnson Dep., at 26-27; Thatcher Dep., at 101-03, 109).[6]  Instead, Johnson mistakenly believed that the reassignment to the Largo office constituted a reasonable accommodation (2014 Johnson Dep., at 30-31; 2019 Johnson Dep., at

---

[6]  Indeed, reasonable accommodations did not fall within the scope of responsibilities in Johnson's role as Chief of Employee and Labor Relations but rather fell within the scope of responsibilities of the local reasonable accommodation coordinator (2014 Johnson Dep., at 16-17).

23, 26-27).  Typically, when an employee requests a reasonable accommodation, the employee would be referred to the local reasonable accommodation coordinator or the employee's supervisor (2019 Johnson Dep., at 17-18).   Given Johnson's mistaken belief regarding Thatcher's request, however, Johnson did not refer Thatcher to Heather Nichol ("Nichol"), the Reasonable Accommodation Coordinator for the Bay Pines VA (2014 Johnson Dep., at 30-33; 2019 Johnson Dep., at 26-28; Doc. 46, Deposition of Heather Nichol ("Nichol Dep."), at 5-6). Dr. Williams subsequently received notice of Thatcher's driving restrictions but could not reassign her from the temporary duty assignment at the Largo office because he could not move an employee from space designated for Geriatrics to one designated for a different department (2019 Williams Dep., at 90-92).  As Thatcher remained in the only available space designated for Geriatrics outside of the two other spaces where Dr. Krygowski worked, Dr. Williams indicated that he did not have the ability to move Thatcher and that only HR could move Thatcher to a space not designated for Geriatrics (2019 Williams Dep., at 90-92).

Following that, on September 9, 2013, Thatcher contacted an EEO counselor, wherein Thatcher set forth the basis for her claims (Doc. 41, Ex. O).  The next day, Thatcher e-mailed Nichol stating that she would like to meet with Nichol to explore her options, given her recent health issues (Doc. 41, Ex. P).  Due to various scheduling issues, Thatcher did not meet with Nichol until September 25, 2013 (Thatcher Dep., Ex. 1-4 & 6-7; Doc. 41, Ex. Q & R).  During their conversation, Nichol discussed a variety of options with Thatcher, including the Family Medical Leave Act ("FMLA"), disability retirement, and reasonable accommodation, but did not discuss Thatcher's issues driving to the Largo office or an accommodation related thereto (Nichol Dep., at 13-14, 18-19).   Thatcher and Nichol exchanged follow-up e-mails the following day, wherein Thatcher referenced the possibility of a reasonable accommodation request, and, in response, Nichol asked Thatcher to identify the accommodation she wanted

(Doc. 41, Ex. R; Thatcher Dep., at 80-81).  Thatcher then indicated that her preferred reasonable accommodation was to work at the Bay Pines VA Sleep Clinic, as she felt she would do better if she was closer to work with less of a drive (Doc. 41, Ex. S; Thatcher Dep., at 81-82 & Ex. 9).  According to Thatcher, she admittedly could not perform the full range of duties required of an ARNP, but she believed that she could be accommodated by moving to the Sleep Clinic or even a chief position, although the latter would constitute a promotion (Thatcher Dep., at 135-40).  Further, Thatcher did not know whether an opening existed for an ARNP in the Sleep Clinic, and later found out that the Sleep Clinic sought a physician not an ARNP, yet she applied for other positions for which she knew she could not perform the duties detailed in the job descriptions, such as heavy lifting, pushing, standing, and pulling (Thatcher Dep., at 63, 113-17, 126-27).  In any event, in response to Thatcher's request for a reasonable accommodation, Nichol informed Thatcher that requests for accommodation presently took about four to six months and instructed Thatcher that, if she wanted to proceed with the request to move to the Sleep Clinic as a request for reasonable accommodation, she needed to obtain medical documentation of her disability and needed to schedule another appointment with Nichol so that Nichol and Thatcher could type up the application together (Doc. 41, Ex. S; Thatcher Dep., at 82-83).

On that same day, Thatcher e-mailed Carol Thompson ("Thompson"), a HR specialist at the Bay Pines VA, regarding expediting a disability request packet and asking to "get this done as fast as possible" (Doc. 41, Ex. T).  Approximately an hour later, Thompson responded to Thatcher letting Thatcher know that Thompson would try to send the application forms to her that day or the next and that it currently took approximately a year or more to obtain approval or disapproval for disability retirement benefits (Doc. 41, Ex. T).  Through further e-mail correspondence that day, Thompson offered to set up an appointment for a conference call

to counsel Thatcher on the disability retirement process (Doc. 41, Ex. T).   Thatcher and Thompson set up a conference call for the afternoon of September 27, 2013, with Thompson cautioning Thatcher that the process would not happen quickly, as Thatcher would need time to gather documentation in support of the disability retirement request (Doc. 41, Ex. T).   On September 27, 2013, Thatcher and Thompson conducted their conference call, with Thompson clarifying matters for Thatcher, and, later that day, Thatcher contacted Nichol to indicate that Thatcher was "conflicted about everything but reaching out for the help" she needed while planning to "sit tight" until she presented for a follow-up appointment with her neurosurgeon to discuss options with him (Doc. 41, Ex. T & U).

Importantly, prior to Thatcher's meeting with Nichol or Thompson, on September 15, 2013, the fact finding, conducted by Social Work Service Section Chief Carrie Meo-Omens ("Meo-Owens"), concluded (Doc. 41, Ex. DD).   After reviewing evidence and conducting interviews with Dr. Williams, Dr. Krygowski, Correira, and Thatcher, Meo-Owens set forth several findings and conclusions, including that inappropriate touching occurred by Thatcher, though not in a sexually inappropriate manner as asserted by Dr. Krygowski (Doc. 41, Ex. DD). Meo-Owens also found that consistent evidence demonstrated that Thatcher approached problems and concerns in the workplace in a manner perceived by others as rude, bullying, defiant, and hostile (Doc. 41, Ex. DD).   Finally, Meo-Owens concluded that Thatcher violated several sections of the Code of Conduct and violated a VA regulation (Doc. 41, Ex. DD).   Meo-Owens identified other issues that came to light during the investigation, including unethical behavior, bullying, a hostile work environment, and concerns regarding Thatcher's mental stability (Doc. 41, Ex. DD).   The new issues were not investigated as part of the fact finding and instead were referred to Dr. Thuriere, given Dr. Williams's recusal, along with the other findings and conclusions (Doc. 41, Ex. DD).

Typically, once a fact finding concludes, and findings of misconduct occur, the information goes to HR for recommendations of disciplinary action (2014 Williams Dep., at 79-80). Until HR renders a decision as to whether disciplinary action should or should not be taken, the employee remains in his or her current detail (2014 Williams Dep., at 80; Whidden Dep., at 46-47). Given that policy, no disciplinary action could be taken against Thatcher until after the conclusion of the fact finding, and, accordingly, she remained in her detail at the Largo office throughout that process (Doc. 41, Ex. J; 2019 Williams Dep., at 86-87, 101-02; 2014 Williams Dep., at 79-80; Nichol Dep., at 26-27; Thuriere Dep., at 17-20, 66-67). Indeed, during their one conversation regarding Thatcher, when Nichol asked Johnson whether Thatcher could return to the main campus, Johnson informed Nichol that the parties remained separated due to and during the fact finding (Nichol Dep., at 26). Accordingly, though the position at the Largo office did not come within Thatcher's scope of practice, Thatcher needed to remain there pending the outcome of the fact finding (2014 Williams Dep., at 63-65, 79-80).

Following the conclusion of the fact finding, Dr. Thuriere indicated that she would discuss the findings with HR and consider a fitness for duty exam for Thatcher (Doc. 41, Ex. EE; Thuriere Dep., at 64-65). According to Johnson, a fact finding could in fact justify a fitness for duty examination (2019 Johnson Dep., at 58-59). After consideration, Dr. Thuriere requested that Thatcher submit to a fitness for duty examination (Thuriere Dep., at 27-29, 64-65; 2014 Williams Dep., at 78; 2019 Johnson Dep., at 59).

In the meantime, Thompson sent Thatcher the disability retirement forms (Doc. 41, Ex. T). On October 7, 2013, Thatcher e-mailed Thompson stating that she saw her neurosurgeon that morning, and the neurosurgeon indicated that Thatcher "needed to go out on disability to avoid further injury and surgeries" since she had "severe spinal conditions that are progressive" and that he was "writing statements and documenting his recommendations" (Doc. 41, Ex. T).

Thatcher also inquired of Thompson who the "Coordinator for employment and handicapped" was, to which Thompson responded that Nichol held that position (Doc. 41, Ex. T).  Thatcher indicated that she would forward her information to Nichol in the next day or two as she wanted "to get this completed and in ASAP" (Doc. 41, Ex. T).

On the same day, Thatcher also contacted a union representative to ask for some guidance, as she spoke with her neurosurgeon that day, after which they decided that it was best for Thatcher to take the early disability retirement option as she experienced significant spinal conditions that were progressive (Doc. 41, Ex. V).  Given the "present conflict and on-going [*sic*] investigation," Thatcher asked how she should proceed with the Supervisor Statement portion of the FERS disability packet, and the union representative directed her to provide it to Nichol to facilitate with Dr. Williams (Doc. 41, Ex. V).  To that end, the union requested that Nichol assist Thatcher in preparing her disability retirement package because Thatcher needed to prepare it remotely, given the reassignment to the Largo office (Nichol Dep., at 14-15, 31).

Notwithstanding the statements regarding her progressive and degenerative spinal conditions, Thatcher testified that Dr. Kowalski recommended that she pursue disability retirement to avoid the stress and harassment she experienced at work rather than solely based upon her back impairment (Thatcher Dep., at 88-96).  According to Thatcher, the stress and harassment began prior to her surgery but escalated upon her return (Thatcher Dep., at 91).  Essentially, Thatcher believed that the daily commute to the Largo office along with the stress, harassment, and retaliation she received contributed to a worsening of her condition (Thatcher Dep., at 88-96; 2019 Thatcher Aff., at ¶13).  According to Nichol, at no point did Thatcher inform her that the request to seek disability retirement related to harassment, retaliation, or anything other than the back impairment (Nichol Dep., at 14-16, 32-33, 39-42).

Shortly thereafter, on October 11, 2013, upon direction by Dr. Thuriere, Dr. Williams sent HR a memo requesting a fitness for duty examination for Thatcher based on the report from the fact finding (Doc. 41, Ex. FF; 2019 Williams Dep., at 94).  Subsequently, on October 23, 2013, HR sent Thatcher a memo stating, among other things, that Thatcher was required to report for a fitness for duty examination due to inappropriate behavior and questionable judgment (Doc. 41, Ex. GG).  The October 23, 2013 memo directed Thatcher to appear for the fitness for duty examination on November 8, 2013 before Dr. Melville D. Bradley ("Dr. Bradley") and informed her that she could obtain physical examinations, tests, and diagnostic procedures from a physician at her own expense as well (Doc. 41, Ex. GG).  The October 23, 2013 memo likewise informed Thatcher of the requirement for her to maintain the ability to perform the full range of her job duties, and the consequences for not meeting the medical standards or physical requirements, as well as her potential eligibility for reasonable accommodation, including who to contact regarding such accommodation (Doc. 41, Ex. GG). Two days later, Dr. Thuriere sent Dr. Bradley a memo designating him to conduct a fitness for duty examination of Thatcher on November 8, 2013, requiring him to submit a copy of the medical evaluation to HR, and to delineate his findings in such a way as to make clear that Thatcher either was physically fit to perform or was not physically fit to perform all of her duties at the full performance level required (Doc. 41, Ex. HH).

Prior to the fitness for duty examination, Thatcher e-mailed Nichol on October 18, 2013 stating that she "thought about it" and determined "that requesting reasonable accommodations is in order" (Doc. 41, Ex. W).  She indicated that she verbally expressed the need for a reasonable accommodation previously to Johnson but was told that she needed to put the request in writing to be official (Doc. 41, Ex. W).  Nichol then assisted Thatcher with submitting her written confirmation of request for accommodation on October 28, 2013 (Doc. 41, Ex. LL;

Thatcher Dep., at 105-07).  In the "accommodation requested" section, Thatcher indicated that she attached her doctor's orders and that she wanted to continue working as tolerated, with no heavy lifting; a limited commute less than 15 minutes, as a driver or passenger; and limited standing or sitting to 15-minute intervals with changes in position (Doc. 41, Ex. LL).

The following day, Thatcher e-mailed Nichol to thank her for her time and guidance the prior day (Doc. 41, Ex. Y).  Thatcher further inquired if Nichol would let her know when the disability forms were filled out, stated that she preferred someone other than Dr. Williams fill those out "due to the circumstances," and asked whether the reasonable accommodation would have any bearing upon the disability review and approval outcomes (Doc. 41, Ex. Y).  To Nichol it appeared that Thatcher sought an interim accommodation while her disability retirement request remained pending, which, at the time, took approximately four to six months (Nichol Dep., at 27-28, 40-41).  Based upon her interactions with Thatcher, Nichol understood that Thatcher's condition may have been so severe that an accommodation might not prove feasible, and that Thatcher needed to discuss the matter with her physicians, but Nichol assisted her with the request for a reasonable accommodation nonetheless (Nichol Dep., at 39-42).  According to Nichol, if the Bay Pines VA provided a reasonable accommodation to Thatcher under the Rehabilitation Act, her application to obtain disability retirement would be denied (Nichol Dep., at 40).

Subsequently, on November 5, 2013, Thatcher sent another e-mail to Nichol, asking when she could pick up her disability packet because, while she tried to remain "patient with the other things," her disability packet became a "priority" to her at that time (Doc. 41, Ex. Z).  According to Thatcher, despite meeting with Nichol to discuss her options and submitting a request for a reasonable accommodation in the prior few weeks, Thatcher felt like she had no other alternative than to seek disability retirement because HR would not give her a reasonable

accommodation at that time (Thatcher Dep., at 107-11).  Notwithstanding, on November 14, 2013, Thatcher again e-mailed Nichol, indicating that she was trying to be flexible and patient but that she needed to "get that disability packet rolling and talk about the reasonable accommodation issue" (Doc. 41, Ex. X).  Nichol agreed to meet with her the next day to discuss the matter (Doc. 41, Ex. X).

Later, on November 18, 2013, Nichol created a Report of Contact documenting a meeting between Thatcher and her (Doc. 41, Ex. AA).  In the Report of Contact, Nichol indicated that the request was placed "on hold per Ms. Thatcher, pending Fitness for Duty, happy where she is currently working as her disability retirement pends" (Doc. 41, Ex. AA). Nichol believed the conversation with Thatcher was significant enough to document, so she created the Report of Contact that day to ensure that something remained in the file regarding the conversation (Nichol Dep., at 35-36).[7]  The following day, Thatcher e-mailed the union representative seeking assistance because she felt that her supervisor had been very difficult, caused uncalled for duress and delay in the disability retirement process, and failed to sign the supervisor portion of the disability retirement package out of retaliation (Doc. 41, Ex. MM).  In that e-mail, Thatcher also stated the following: "I came to the difficult decision that disability retirement was the only option.  As discussed with my team of doctors[,] continuing to work as ARNP at the VA would put me at a higher risk [for] failed back complication, further damage and possibly the need for further surgery, which I prefer to avoid at all cost" (Doc. 41, Ex. MM).

Thatcher followed up with Nichol on November 21, 2013 to make sure everything "was on course" and to see if Nichol needed anything further (Doc. 41, Ex. BB).  One minute later, Nichol responded that everything was good and that she sent Thatcher's packet out and received

---

[7]  Thatcher stated that she may have said that to Nichol but that it could also have been "fabricated after the fact" (Thatcher Dep., at 117-19).

a notice of receipt that morning (Doc. 41, Ex. BB).  On December 10, 2013, Thatcher thanked Nichol "for going above and beyond" and stated that she realized and appreciated that Nichol advocated for her (Doc. 41, Ex. CC).

In the interim, in accordance with his directive, Dr. Bradley conducted the fitness for duty examination on November 8, 2013 (Doc. 41, Ex. II).  After reviewing several documents and conducting a physical examination of Thatcher, Dr. Bradley determined that, as of November 8, 2013, Thatcher could not fully perform the ARNP functional requirements as identified in the ARNP job description and therefore was not fit for duty (Doc. 41, Ex. II).  Following the fitness for duty examination, a Physical Standards Board convened in December 2013 to review and discuss documentation regarding Thatcher's ability to perform the essential functions of an ARNP position (Doc. 41, Ex. JJ).  Upon review, the Physical Standards Board concluded that Thatcher was "unable to perform the essential functions of an ARNP based upon her physical limitations" (Doc. 41, Ex. JJ).  The Physical Standards Board determined that Thatcher was "unfit for duty" and noted that, in her present condition, Thatcher remained unable to perform her duties as an ARNP – a determination with which Dr. Thuriere, as Chief of Staff, concurred (Doc. 41, Ex. JJ; Thuriere Dep., at 66).

Notwithstanding, with Thatcher's pending disability retirement request, HR never initiated any disciplinary action following the fact finding nor any other action regarding Thatcher's employment (Doc. 41, Ex. J; 2019 Williams Dep., at 86-87, 101-02; 2014 Williams Dep., at 79-80; Nichol Dep., at 26-27; Thuriere Dep., at 66-67).  According to Dr. Thuriere, when an employee submits a request for disability retirement, and that employee is assigned on detail, the employee generally remains on that detail until the disability retirement processes (Thuriere Dep., at 66-67).  Based on the pending disability retirement request, Thatcher

remained detailed at the Largo office until the approval of her disability retirement in July 2014 (Thuriere Dep., at 66-67; Thatcher Dep., at 143-44).

Notably, at the time of the approval of her disability retirement, Thatcher only worked in the Largo office about 20 hours per week while using FMLA leave and leave without pay (Thatcher Dep., at 144).  At that time, Thatcher also indicated to her physician that she could not "even handle three hours work a day" (Thatcher Dep., at 145).  In her position at the Largo office, Thatcher's salary remained the same and she maintained the ability to take breaks as needed and to get up and walk around, each of which were integral given the limitations from Dr. Kowalski (Thatcher Dep., at 143-46).  As Nichol indicated, the position at the Largo office met Thatcher's needs allowing her to work when she could and not work when she could not, which would not necessarily occur if she moved back to the main campus (Nichol Dep., at 29). Despite the available modifications for the position at the Largo office, Thatcher found the position "demeaning" and the situation "very stressful" (Thatcher Dep., at 145).

Following her disability retirement, Thatcher initiated this action against the VA, asserting claims under the Rehabilitation Act for (1) disability discrimination for failure to engage in an interactive process (Count I); (2) disability discrimination for failure to provide a reasonable accommodation (Count II); and (3) retaliation relating to her disability and requests for reasonable accommodation (Count III) (Doc. 13).  According to Thatcher, the VA violated the Rehabilitation Act by failing to engage in the interactive process in response to her requests for reasonable accommodations, or to provide her with such reasonable accommodations, beginning in August 2013 and continuing until her disability retirement in July 2014.  Thatcher further alleged that the VA denied her reasonable accommodations in retaliation for making multiple requests for reasonable accommodations under the Rehabilitation Act and for subsequently seeking EEO counseling and for filing an EEOC charge in 2013.

By the instant motion (Doc. 41), the VA seeks summary judgment on all of Thatcher's claims, arguing that Thatcher's reasonable accommodation claim fails because she cannot identify a vacant, funded position that would have accommodated her and because she cannot establish that she was a qualified individual.  The VA additionally asserts that Thatcher's claim regarding the failure to engage in the investigative process fails as no such cause of action exists.    Finally, the VA argues that Thatcher's retaliation claim lacks merit because no causal connection exists between Thatcher's protected activity and either Thatcher remaining in Largo or undergoing a fitness for duty examination.  Even so, the VA contends, Thatcher cannot rebut the VA's legitimate business reasons for those actions.

In her response (Doc. 61), which almost entirely lacks legal authority, Thatcher contends that summary judgment should not be granted.  Namely, Thatcher argues, in a cursory fashion, that (1) the violation of the VA's own policy on reasonable accommodations demonstrates that the VA violated the Rehabilitation Act; (2) the reasons for requiring Thatcher to commute to the Largo office for work lack credibility; (3) the VA's argument regarding no vacant positions fails because Thatcher could have performed the same position she held in Largo anywhere; (4) the VA's argument regarding the failure to engage in the interactive process fails; and (5) the actions taken by Dr. Williams indicate that he retailed against her.  In its reply (Doc. 65), the VA contends that Thatcher cannot now save her reasonable accommodation claim by requesting a different accommodation, *i.e.* a clerical position working from either home or the Bay Pines VA, years later during litigation.  The VA further contends that Thatcher cannot meet her burden to demonstrate that the reason for the alleged retaliatory acts were untrue nor that retaliation for EEO activity constituted the real reason.

## II.      Standard of Review

Summary judgment is appropriate where the movant demonstrates that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The existence of some factual disputes between the parties will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original).  The substantive law applicable to the claims will identify which facts are material.  *Id.* at 248.  In reviewing the motion, courts must view the evidence and make all factual inferences in a light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant.  *Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co.*, 483 F.3d 1265, 1268 (11th Cir. 2007) (citation omitted).

## III.     Discussion

The Rehabilitation Act provides the exclusive remedy for a federal employee seeking to assert disability-related employment discrimination claims.  *See* 42 U.S.C. § 12111(5)(B) (defining "Employer" under the ADA and specifically excluding the United States or a corporation wholly owned by the government of the United States); *Tarmas v. Mabus*, No. 3:07-cv-290-J-32TEM, 2010 WL 3746636, at *3 (M.D. Fla. Sept. 21, 2010) (citations omitted), *aff'd sub. nom. Tarmas v. Sec'y of Navy*, 433 F. App'x 754 (11th Cir. 2011). To that end, the Rehabilitation Act "prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability."  *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (citation omitted).   Claims for discrimination and retaliation under the

Rehabilitation Act are governed under the same standard applicable to those brought under the Americans with Disabilities Act ("ADA"), such that cases decided under one act as precedent for cases decided under the other.  29 U.S.C. § 791(f); *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000); *see Palmer v. McDonald*, 624 F. App'x 699, 702 (11th Cir. 2015) (citations omitted).

### A.      Count I – Disability Discrimination for Failure to Engage in an Interactive Process

In Count I, Thatcher alleges that the VA violated the Rehabilitation Act "by failing to engage in an interactive process in response to [her] requests for reasonable accommodations beginning in August 2013 and continuing until her disability retirement in July[] 2014" (Doc. 13, at ¶60).  The VA contends that summary judgment, or even judgment on the pleadings, is appropriate as to Thatcher's claim for failure to engage in the interactive process because a defendant cannot be held liable for failing to engage in the interactive process.  Under the ADA regulations, an employer *may*, in some circumstances, need to "initiate an informal, interactive process" with a disabled employee to determine an appropriate reasonable accommodation.  *Frazier-White v. Gee*, 818 F.3d 1249, 1257 (11th Cir. 2016) (citing 29 C.F.R. § 1630.2(*o*)(3)) (internal quotation omitted).  "When an employee fails to satisfy his burden of identifying an accommodation that would be reasonable, however, no liability attaches to the employer for failing to engage in an 'interactive process.'"  *Kassa v. Synovus Fin. Corp.*, 800 F. App'x 804, 809 (11th Cir. 2020) (citations omitted); *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997) (stating that, "where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant") (citation omitted).  Likewise, no cause of action exists for failure to investigate possible accommodations.  *McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010) (citation omitted).  Indeed, "an employer's failure to investigate does not relieve the plaintiff of

22

the burden of proving the availability of a reasonable accommodation." *Id.* (citation omitted). To hold otherwise would mean that an employee could assert a cause of action even though there was no possible way for the employer to accommodate the employee's disability.  *Id.* at 682 (citation omitted).

In support of her claim, Thatcher cites only to excerpts of provisions in the VA Handbook (Doc. 61, at 15-17 & Ex. 12, at 9-14, 20).  Thatcher essentially contends that, because the VA did not strictly follow its internal procedures regarding the processing of reasonable accommodation requests, the VA failed to engage in an interactive process in violation of the Rehabilitation Act.  Thatcher fails, however, to cite to *any* legal authority in support of her claim, much less legal authority demonstrating that a purported failure to adhere to its own internal procedures regarding the processing of requests for reasonable accommodations equates to a violation by the VA of the Rehabilitation Act.

Regardless, even looking to the provisions highlighted by Thatcher, nothing in the VA Handbook directs that the failure to adhere to internal processing procedures results in a violation of the Rehabilitation Act.  Instead, the provisions speak only to the *possibility* that a failure to process an accommodation request within the timeframe provided in the VA Handbook *could* constitute undue delay in violation of the Rehabilitation Act (Doc. 61, Ex. 12, at 12).  Namely, the VA Handbook sets for the timeframe for processing requests for accommodations as follows:

> All requests for accommodation should be processed as soon as possible so that the approval and the appropriate accommodation or the denial can be provided promptly.  Requests from applicants should be expedited and processed within ten calendar days.  Requests from employees should be processed within 30 calendar days, but preferably within less time.  Failure to process some accommodation requests in less than 30 calendar days could constitute undue delay in violation of the Rehabilitation Act.

(Doc. 61, Ex. 12, at 12).  Nothing in this provision, or any other provision relied upon by Thatcher, provides for liability on behalf of the VA for failing to engage in an interactive process, or even speaks in terms of absolutes.

Rather, the law remains clear that no claim for failure to engage in an interactive process can exist where an employee fails to identify a reasonable accommodation.  *See Kassa* 800 F. App'x at 809 (citations omitted); *Willis*, 108 F.3d at 285; *see also Frazier-White*, 818 F.3d at 1257-58 (finding the plaintiff's request for indefinite light-duty status unreasonable as a matter of law, and her request for reassignment unsupported by evidence that it would have enabled her to perform the essential functions of any specific, vacant full-duty position, thereby providing no basis for imposing liability on the defendant for failing to engage in an "interactive process" to identify accommodations); *Rabb v. School Bd. of Orange Cty., Fla.*, 590 F. App'x 849, 853 n.5 (11th Cir. 2014) (indicating that, where a plaintiff could not demonstrate a reasonable accommodation, the employer's lack of investigation into reasonable accommodation was unimportant, and finding that, because the plaintiff failed to meet her burden to show that a reasonable accommodation could have been made, there was no need to address the employer's efforts to find some other accommodation).  Given that Thatcher failed to identify a reasonable accommodation, as discussed in greater detail below, no liability attaches to the VA for the failure to engage in an interactive process with Thatcher. Accordingly, summary judgment is granted as to Count I.

### B.    Count II – Disability Discrimination for Failure to Provide a Reasonable Accommodation

Next, in Count II, Thatcher alleges that the VA violated the Rehabilitation Act by failing to provide her with reasonable accommodations beginning in August 2013 and continuing until her disability retirement in July 2014 (Doc. 13, at ¶63).  The VA argues that summary judgment should be granted on Thatcher's claim for failure to provide a reasonable accommodation

because Thatcher cannot demonstrate that she is a qualified individual.  The VA further contends that Thatcher did not and, indeed, cannot identify a vacant, funded position that could accommodate her.

### i.    *McDonnell Douglas* Framework

Under the Rehabilitation Act, an aggrieved employee may establish a claim of unlawful discrimination through either direct or circumstantial evidence.  *Cf. Gooden v. Internal Revenue Serv.*, 679 F. App'x 958, 964 (11th Cir. 2017) (citations omitted).  Where the record fails to reflect any direct evidence of discrimination, as in the instant case, claims under the Rehabilitation Act are governed by the familiar *McDonnell Douglas*[8] burden-shifting scheme applied to Title VII employment discrimination claims.  *See Banim v. Fla. Dep't of Bus. & Prof'l Regulation*, 689 F. App'x 633, 635 (11th Cir. 2017) (citing *Stutts v. Freeman*, 694 F.2d 666, 669 (11th Cir. 1983)); *Gooden*, 679 F. App'x at 964 (citations omitted); *Farid v. Postmaster Gen.*, 625 F. App'x 449, 451 (11th Cir. 2015) (*per curiam*) (citing *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)).  Initially, the plaintiff must establish a *prima facie* case of discrimination, which creates a presumption that the employer unlawfully discriminated against the employee.  *See Gooden*, 679 F. App'x at 964 (citations omitted); *see Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000) (stating that the burden is on the employee to establish a *prima facie* case of disability discrimination).  To establish a *prima facie* case for a discrimination claim under the Rehabilitation Act, a plaintiff must demonstrate that (1) she has a disability; (2) she is otherwise qualified for the position, *i.e.*, a "qualified individual"; and (3) she was subjected to unlawful discrimination as a result of her disability.  *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017); *Mullins*, 228 F.3d at 1313; *see Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000) (citation

---

[8]  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

omitted).   Once a plaintiff demonstrates these elements, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action.  *Brooks v. City Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006).   The defendant need not demonstrate that the proffered reasons actually motivated the adverse employment action, but, instead, must produce evidence that raises a genuine issue of material fact as to whether it discriminated against the plaintiff.  *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (citations omitted); *Alvarez*, 610 F.3d at 1265 (citation omitted).

If the defendant can articulate one or more legitimate, nondiscriminatory reasons, the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason constitutes pretext for illegal discrimination.  *Brooks*, 446 F.3d at 1162.   At that point, the plaintiff must come forward with evidence sufficient to permit a reasonable factfinder to conclude that the reasons proffered by the defendant were not the actual reasons for the adverse employment decision.  *Kragor*, 702 F.3d at 1308-09 (citation omitted).   In establishing pretext, the plaintiff must show both that the reason was false and that the discrimination was the real reason for the adverse employment action.  *See Brooks*, 446 F.3d at 1163 (citation omitted).   To establish pretext, therefore, the plaintiff must show "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Alvarez*, 610 F.3d at 1265 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).   Further, in attempting to show pretext, the plaintiff must meet the employer's reason "head on and rebut it" rather than simply recasting the employer's reason, substituting his or her business judgment for that of the employer, or otherwise quarreling with the wisdom of the reason.  *Alvarez*, 610 F.3d at 1265-66 (citation omitted).   If the plaintiff fails to proffer sufficient evidence to create a genuine issue of material

fact regarding whether each of the defendant's articulated reasons is pretextual, the defendant is entitled to summary judgment on the plaintiff's claim.  *See Dockery v. Nicholson*, 170 F. App'x 63, 66 (11th Cir. 2006) (citing *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000)).

ii.     Qualified Individual

The ADA, and, concomitantly, the Rehabilitation Act, prohibits discrimination against a qualified individual on the basis of disability.  *See Frazier-White*, 818 F.3d at 1255 (citation omitted).  For purposes of the Rehabilitation Act, an individual is under a "disability" if he or she has "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A); 29 U.S.C. § 705(9) (indicating that the term "disability" under the Rehabilitation Act is given the meaning provided in 42 U.S.C. § 12102); *Boyle*, 866 F.3d at 1288.  Here, the VA does not dispute that Thatcher's back impairment constitutes a disability.  Rather, the VA contends that Thatcher is not an otherwise qualified individual.

In this context, a "qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8); *Boyle*, 866 F.3d at 1288.  With respect to an individual with a disability, the term "qualified" means "that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and with or without reasonable accommodation, can perform the essential functions of such position."  29 C.F.R. 1630.2(m); *Boyle*, 866 F.3d at 1288 ("A person with a disability is 'otherwise qualified' if he is able to perform the essential functions of the job in question with or without reasonable accommodation.").  In determining whether an employee is an otherwise qualified individual

and whether a reasonable accommodation can be made for the employee, the determination hinges upon reference to a specific position. *Boyle*, 866 F.3d at 1288 (citation omitted).

Determining whether an individual is "qualified" for a position involves a two-step process, wherein the individual must (1) satisfy the prerequisites for the position by demonstrating sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job; and (2) demonstrate that she can perform the essential functions of the job, either with or without reasonable accommodations. *Gary v. Ga. Dep't of Human Res.*, 206 F. App'x 849, 851-52 (11th Cir. 2006) (citing *Reed*, 206 F.3d at 1062). Given that the parties do not dispute Thatcher's qualifications for an ARNP position, Thatcher must demonstrate either that she could perform the essential functions of her job without accommodation, or, failing that, show that she could perform the essential functions of her job with a reasonable accommodation. *Davis*, 205 F.3d at 1305 (citation omitted). If Thatcher could not perform the essential functions of the position she held or desired, even with an accommodation, by definition she is not a qualified individual. *Rabb*, 590 F. App'x at 850 (citing *Davis*, 205 F.3d at 1305).

The term "essential functions" means the fundamental job duties of the employment position the individual with a disability holds or desires but does not include the marginal functions of the position. 29 C.F.R. § 1630.2(n)(1). Courts evaluate whether a function is essential on a case-by-case basis. *Davis*, 205 F.3d at 1305. To determine the essential functions of a position, courts must consider "the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see* 29 C.F.R. § 1630.2(n)(3)(i) & (ii). Courts may also consider other factors, such as (1) the amount of time spent on the job performing the

28

function; (2) the consequences of not requiring the incumbent to perform the function; (3) the terms of a collective bargaining agreement; (4) the work experience of past incumbents in the job; or (5) the current work experience of incumbents in similar jobs.   29 C.F.R. § 1630.2(n)(3)(iii)-(vii).

Here, the record reflects that Thatcher could not perform the essential functions of her Geriatrics ARNP position.  Specifically, in conducting the fitness for duty examination, Dr. Bradley reported several findings, including the following:

> (2)     Per the OF-178 today, Ms. Thatcher has disclosed that she is presently unable to fully perform all of the duties of ARNP due to medical conditions (see self-disclosure, ref: pg 2 of OF-178, Part A(5)).  We also reviewed her ARNP functional requirements on page 4 of the OF-178; she stated and marked off those requirements that she could not fully perform.  Per review of the SF-93 she completed, she disclosed medical conditions that are consistent with her inability to perform the functional requirements which she had referred to.
>
> (3)     The hands on physical examination today was consistent with deficits caused by her medical conditions and, in my opinion, her inability to perform the following functional requirement[s] as depicted on page 4 of the OF-178: 'heavy lifting', 'straight pulling (8 hrs)', 'pushing (8 hrs)', 'walking and standing (8 hrs)', and 'repeated bending (8 hrs)'.
>
> (4)     After considering the results of today's history and physical examination, it is my opinion that, at present, Ms. Thatcher is not able to fully perform the ARNP functional requirements as depicted on page 4 of the OF-178; and therefore is not fit for duty.

(Doc. 41, Ex. II).  Upon questioning about the results from the fitness for duty examination, Thatcher stated that she found paragraphs two and three of Dr. Bradley's report accurate and agreed with Dr. Bradley's findings in that regard (Thatcher Dep., at 137).  She also indicated that, even with accommodation, she could not have performed the job functions of pushing for eight hours, walking for eight hours, or standing for eight hours (Thatcher Dep., at 138).  Even in her formal written request for an accommodation, Thatcher indicated that she requested accommodations to continue working as tolerated with no heavy lifting, limiting her commute to less than 15 minutes, and standing or sitting limited to 15-minute intervals with a change of

position (Doc. 41, Ex. LL).  Beyond that, upon review of the findings from Dr. Bradley, Dr. Kowalski, and additional documentation provided by Thatcher, three doctors convened to issue a Board Action concluding that Thatcher was "unable to perform the essential functions of an ARNP based upon her physical limitations" (Doc. 41, Ex. JJ).  Thatcher does not contend that she could perform the functions of a Geriatrics ARNP with or without accommodation.  Given the foregoing, therefore, Thatcher cannot demonstrate that she constituted a "qualified individual" with respect to her Geriatrics ARNP position.

As the record forecloses any argument that Thatcher constituted a qualified individual for purposes of the Geriatrics ARNP position, Thatcher contends that she could perform other ARNP positions, even with her physical limitations (Thatcher Dep., at 114-17, 138-40; Doc. 41, Ex. S).  Specifically, Thatcher asserts that she could perform the essential functions of an ARNP position in the Sleep Clinic (Thatcher Dep., at 138-40; Doc. 41, Ex. S).[9]  "When an employee seeks reassignment as a reasonable accommodation for a disability, the relevant question when deciding whether she is a qualified individual is not whether the employee is qualified for her current position, but whether she is qualified for the new job."  *United States Equal Emp't Opportunity Comm'n v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1344 (11th Cir. 2016) (citation omitted).  As the VA argues, nothing in the record demonstrates what the essential functions of an ARNP position in the Sleep Clinic are, whether the essential functions differ from those of a Geriatrics ARNP, or whether Thatcher could perform those essential

---

[9]  During her deposition, Thatcher indicated that she could also likely perform the functions of a "chief position," which she classified as "an advanced nursing job" (Thatcher Dep., at 114-15, 139).  As Thatcher stated, she applied for several chief positions *prior to* her back surgery, and a move from her position as a Geriatrics ARNP to the chief position would have constituted a promotion (Thatcher Dep., at 139-40).  Though an employer may be required to reassign a disabled employee, that duty does not require the employer to create a new position for or promote the disabled employee.  *Boyle*, 866 F.3d at 1289.  Accordingly, the VA was not required to promote Thatcher to a chief position to accommodate her, and Thatcher does not argue to the contrary.

functions.  Furthermore, the Board Action indicated that Thatcher lacked the ability to perform the essential functions of an ARNP based upon her physical limitations and, notably, did not limit that finding specifically to a Geriatrics ARNP (*see* Doc. 41, Ex. JJ).  Such a finding seems to preclude Thatcher from asserting that she could perform the essential functions of any ARNP position at the VA.  Indeed, Thatcher's own description of her limitations appears to likewise preclude Thatcher from asserting that she could perform the essential functions of any ARNP position at the VA (*see* Doc. 41, Ex. LL).  Regardless, even viewing the facts in the light most favorable to Thatcher, since sje failed to demonstrate what the essential functions of the ARNP in the Sleep Clinic entailed and whether she could perform those essential functions, Thatcher failed to demonstrate that she was a qualified individual with respect to the ARNP position in the Sleep Clinic.  Given the failure to establish that she was a qualified individual, summary judgment on Count II is warranted on that basis.

### iii.      Reasonable Accommodation

Going further, summary judgment on Count II is also warranted because Thatcher failed to identify a vacant position as her proposed reasonable accommodation.  An employer discriminates against an otherwise qualified individual with a disability where the employer fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]"  42 U.S.C. § 12112 (b)(5)(A); *Boyle*, 866 F.3d at 1288 (citation omitted).  What constitutes a reasonable accommodation depends on the particular circumstances of the case, but reasonable accommodations may include job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modification of equipment or devices; appropriate adjustment or modifications

of examinations, training materials, or policies; the provision of qualified readers or interpreters and other similar accommodations for individuals with disabilities. 42 U.S.C. § 12111(9)(B); *see Frazier-White*, 818 F.3d at 1255 (citation omitted).

The Rehabilitation Act does not, however, require an employer to accommodate an employee in any manner in which that employee desires nor to create a position for the disabled employee. *Curry v. Sec'y, Dep't of Veterans Affairs*, 518 F. App'x 957, 964-65 (11th Cir. 2013) (citations and quotations omitted); *see Boyle*, 866 F.3d at 1289 (citation omitted) ("The Rehabilitation Act does not require employers to create new positions for employees with disabilities"). Further, employers maintain no "obligation under the Act to employ people who are not capable of performing the duties of the employment to which they aspire." *Sutton v. Lader*, 185 F.3d 1203, 1211 (11th Cir. 1999) (citations omitted). The burden remains with the employee to identify an accommodation, demonstrate its reasonableness, and show that the accommodation would allow him or her to perform the essential functions of the job in question. *See Boyle*, 866 F.3d at 1289 ("The plaintiff bears the burden of identifying an accommodation and showing that the accommodation would allow him to perform the essential functions of the job in question"); *Frazier-White*, 818 F.3d at 1255 (citation omitted) ("The employee has the burden of identifying an accommodation and demonstrating that it is reasonable.").

As noted above, Thatcher stated that she wanted reassignment to a position as an ARNP in the Sleep Clinic (Thatcher Dep., at 114-17, 138-40; Doc. 41, Ex. S). "'Reassignment to another position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified.'" *Boyle*, 866 F.3d at 1289 (quoting *Willis*, 108 F.3d at 284). Thatcher testified that she did not know whether an open, funded ARNP position existed in the Sleep Clinic at the time she sought a reasonable accommodation (Thatcher Dep., at 114-17, 138-40), and she offered nothing in the record to demonstrate that such an opening

existed at that time.  In fact, Thatcher indicated that an unnamed individual talked about an open position in the Sleep Clinic, but Thatcher "later found out that they wanted a doctor" for that open position, and she could not "say with 100 percent certainty" that an open, funded ARNP position was available in the Sleep Clinic (Thatcher Dep., at 115-17).  She simply asserted that she thought there were some vacancies where the VA could place her (Thatcher Dep., at 116), but she failed to point to any evidence of record in support of that assertion.  Such speculation does not satisfy Thatcher's burden of demonstrating a reasonable accommodation existed.  *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 n.5 (11th Cir. 2001) (finding that the plaintiff failed to identify any positions available for reassignment and the testimony that the plaintiff was "sure" there were "several positions" open at his employer's business at the relevant time consisted solely of the plaintiff's speculation regarding the existence of vacant positions and fell "far short of the evidence needed to establish that a specific reasonable accommodation, in the form of a vacant position, actually existed"); *see Willis*, 108 F.3d at 286 (finding that the plaintiff presented no competent evidence that *any* alternative position existed, vacant or otherwise, regardless of whether she was qualified for it, where the only evidence the plaintiff offered that a vacant position existed at all was a hearsay statement, contained in her affidavit).

Furthermore, Thatcher testified that if the VA wanted to, it could create a funded position or create a temporary position, as she had "seen them do it plenty of times before" (Thatcher Dep., at 116).  The Rehabilitation Act does not require the VA to create a position to accommodate Thatcher, however.  Indeed, the VA was not required to reassign Thatcher to a non-vacant position, nor was it obligated to create an ARNP position or to remove someone else from an ARNP position in order to create a vacancy.  *Boyle*, 866 F.3d at 1290 (citations omitted); *see Curry*, 518 F. App'x at 964-65 ("The Rehabilitation Act does not require an

employer to create a position for a disabled employee."); *see Dickerson v. Sec'y, Dep't of Veterans Affairs*, 489 F. App'x 358, 361 (11th Cir. 2012) (stating that the Rehabilitation Act did not require the VA to reassign the plaintiff to a position where there were no vacancies, create an entirely new position for her, or reallocate the essential functions of her nursing position); *see also Sutton*, 185 F.3d at 1211 (finding that the undisputed evidence demonstrated that no light-duty positions existed and that the Rehabilitation Act did not require the employer to create one for the plaintiff).  Accordingly, given Thatcher's failure to provide evidence of a vacant, funded position, summary judgment is warranted on Count II.  *See Boyle*, 866 F.3d at 1289-90 (affirming the district court's grant of summary judgment where the plaintiff failed to meet his burden of identifying a reasonable accommodation).

Thatcher's suggestion in her response to the instant motion that she could have been accommodated by telecommuting or moving to the Education Department or that she "could have done the same position she was doing in Largo anywhere" does nothing to further her position (Doc. 61, at 17-18).  The employee bears the immediate burden of identifying an accommodation and the ultimate burden of persuasion that the accommodation is reasonable, such that, at summary judgment, she must produce evidence that a reasonable accommodation was available.  *Hargett v. Fla. Atl. Univ. Bd. of Tr.,* 219 F. Supp. 3d 1227, 1243 (S.D. Fla. 2016) (citations omitted).  Thatcher produced no evidence in support of her contention that she could have performed the essential duties of any open, funded position by telecommuting, moving to the Education Department, or performing the same position in the Largo office anywhere. Instead, Thatcher points only to the deposition testimony of Dr. Thuriere regarding the Education Department, which Thatcher mischaracterizes (Doc. 61, at 18; Thuriere Dep., at 56-59).  During her deposition, Dr. Thuriere stated that the options for where to send nurse practitioners and doctors who need to be distanced from a section or clinic in the hospital is

fairly limited because their skill set is so narrow, and often that either leaves the Largo office or the Education Department as an option (Thuriere Dep., at 56-57).  Dr. Thuriere did not testify that the Education Department maintained any vacant, funded positions for which Thatcher could perform the essential functions at the time she requested a reasonable accommodation (Thuriere Dep., at 56-59).   Further, Dr. Thuriere did not provide testimony relating to telecommuting (Thuriere Dep., at 56-69).  Likewise, Dr. Thuriere did not provide testimony regarding whether Thatcher could perform the same position as she performed at the Largo office elsewhere, as Dr. Thuriere only indicated that, to the extent an employee is not doing something consistent with his or her training, a position would depend on the needs of the organization, which would typically involve a decision between the transferring and receiving service chiefs  (Thuriere Dep., at 56-59).  Thatcher thus failed to demonstrate that a reasonable accommodation was available.  Accordingly, summary judgment is granted on Count II.

### C.      Count III – Retaliation

Finally, in Count III, Thatcher sets forth a claim for retaliation under the Rehabilitation Act, alleging that the VA denied her reasonable accommodations in retaliation for making multiple requests for reasonable accommodations under the Rehabilitation Act and for subsequently seeking EEO counseling and filing an EEOC charge in 2013 (Doc. 13, at ¶66)  The VA contends that summary judgment is warranted on Thatcher's retaliation claim because (1) no causal connection exists between Thatcher's protected activity and her remaining in a position at the Largo office or for her undergoing a fitness for duty exam and (2) Thatcher cannot rebut the VA's legitimate business reasons for its actions.  With respect to retaliation claims, the Rehabilitation Act incorporates the anti-retaliation provisions from the ADA.  29 U.S.C. § 791(f); *Morales v. Ga. Dep't of Human Res., Dep't of Human Res., Div. of Fam. & Children Servs.*, 446 F. App'x 179, 183 (11th Cir. 2011) (citations omitted); *Burgos-Stefanelli*

*v. Sec'y, U.S. Dep't of Homeland Sec.*, 410 F. App'x 243, 245 (11th Cir. 2011). Namely, under the ADA's anti-retaliation provision, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). As the anti-retaliation provision is similar to Title VII's prohibition on retaliation, courts assess retaliation claims brought under the Rehabilitation Act and the ADA under the same framework used in assessing Title VII retaliation claims. *Morales*, 446 F. App'x at 183; *Burgos-Stefanelli*, 410 F. App'x at 245 (citations omitted).

As with claims of discrimination under the Rehabilitation Act, where, as here, the plaintiff brings the retaliation claim based upon circumstantial evidence, courts apply the *McDonnell-Douglas* burden-shifting framework as applied to Title VII retaliation claims. *Burgos-Stefanelli*, 410 F. App'x at 245-46 (citations omitted); *see also Gooden*, 679 F. App'x at 964 (citations omitted); *Banim*, 689 F. App'x at 635-36 (citation omitted); *Farid*, 625 F. App'x at 451 (citation omitted). To establish a *prima facie* case of retaliation, therefore, Thatcher must demonstrate that (1) she engaged in a statutorily protected expression; (2) she suffered a materially adverse employment action; and (3) a causal link exists between the materially adverse employment action and her protected expression. *Kassa*, 800 F. App'x at 810; *Burgos-Stefanelli*, 410 F. App'x at 246; *Garrett v. Univ. of Ala. at Birmingham Bd. of Tr.*, 507 F.3d 1306, 1316 (11th Cir. 2007) (citation omitted). If Thatcher can demonstrate a *prima facie* case, the burden shifts to the VA to come forward with a non-retaliatory reason for the challenged employment action that negates the inference of retaliation. *Burgos-Stefanelli*, 410 F. App'x at 246; *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (citation omitted); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287

(11th Cir. 1997) (citation omitted).  If the VA provides such a reason, the burden shifts back to Thatcher to demonstrate by a preponderance of the evidence that the VA's proffered reason constitutes pretext for retaliation.  *Kassa*, 800 F. App'x at 810 (citing *Stewart*, 117 F.3d at 1287); *Burgos-Stefanelli*, 410 F. App'x at 246.  A reason does not constitute pretext unless Thatcher can demonstrate both that the reason was false, and that retaliation was the real reason. *Tarmas*, 433 F. App'x at 761 (citing *Brooks*, 446 F.3d at 1163); *Burgos-Stefanelli*, 410 F. App'x at 247 (citing *Brooks*, 446 F.3d at 1163).  "If 'the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason,' or showing that the decision was based on erroneous facts.'"  *Burgos-Stefanelli*, 410 F. App'x at 247 (quoting *Chapman*, 229 F.3d at 1030).  The "ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff."  *Pennington*, 261 F.3d at 1266 (citation omitted).

As to the first element of the *prima facie* case, Thatcher alleges retaliation for requesting a reasonable accommodation and for engaging in EEO activity.  According to Plaintiff, her initial request for a reasonable accommodation occurred on August 26, 2013,[10] when she delivered a letter from her neurologist to Johnson regarding the need to refrain from physical activity and from driving a distance of more than five miles (Doc. 41, Ex. L, at 6).  Her first EEO activity occurred when she contacted an EEO counselor on September 9, 2013 (Doc. 41, Ex. O).  Both the request for a reasonable accommodation and the filing of an EEO complaint

---

[10]  As the VA notes, in her motion, Thatcher identifies August 19, 2013 as the date she first submitted her request for a reasonable accommodation, yet she provides no record citation in support (Doc. 61, at 9).  Given her statement in her sworn interrogatory responses identifying August 26, 2013 as the date she submitted her first request for a reasonable accommodation, and her testimony reiterating August 26, 2013 as the pertinent date, the Court will utilize that date as the date Thatcher first engaged in protected activity (Doc. 41, Ex. L, at 6; Thatcher Dep., at 60, 100).

satisfy the first element of a *prima facie* case for retaliation.  *See Frazier-White*, 818 F.3d at 1258 (indicating that a request for a reasonable accommodation satisfies the first element); *Palmer*, 624 F. App'x at 702 ("The first element may be met by making a charge or participating in a Title VII investigation. … The first element also may be met by a request for a reasonable accommodation, which is a statutorily protected activity as long as the plaintiff has a good faith, objectively reasonable belief that he was entitled to those accommodations."); *see Morales*, 446 F. App'x at 183 ("Title VII prohibits an employer from retaliating against an employee for filing a charge or reporting discrimination."); *see Burgos-Stefanelli*, 410 F. App'x at 246 (citation omitted) (indicating that the filing of an EEO claim constitutes statutorily protected expression).

With respect to the second and third elements of the *prima facie* case, Thatcher alleges five purported acts of retaliation, as follows:

1. August 16, 2013 – Dr. Williams informing Thatcher about the charge of misconduct and the reassignment to the Bay Pines VA office in Largo

2. August 20, 2013 – Dr. Krygowski filing a police report

3. September 15, 2013 – Dr. Williams's failure to return Thatcher from the Largo office at the conclusion of the fact finding

4. September 20, 2013 – One day after Thatcher contacted the VA's Office of Resolution Management, Thatcher held a conversation with a co-worker regarding the co-worker being asked to write a Report of Contact about Thatcher due to "inappropriate conduct," which the coworker refused to do

5. October 23, 2013 – HR memo to Thatcher regarding the scheduling of a fitness for duty examination "due to inappropriate behavior and questionable judgment"

(Doc. 41, Ex. L, at 8-9).  To satisfy the second element of her *prima facie* case, Thatcher must demonstrate that she suffered injury or harm in the form of a materially adverse employment action.  *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006).   As the Supreme Court recognized in *Burlington*, the "antiretaliation provision protects an individual

not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67.  To meet the second prong, Thatcher thus "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citations and internal quotation marks omitted).  The materiality of the injury or harm is crucial to separating significant from trivial harms, as neither Title VII nor the Rehabilitation Act set forth "'a general civility code for the American workplace.'"  *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  The antiretaliation provisions seek to prevent interference with unfettered access to remedial mechanisms by prohibiting employer actions likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers.  *Burlington*, 548 U.S. at 68.  "And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  *Id.* (citation omitted).

As to the second element, Thatcher sets forth no argument nor any legal authority as to whether any of the acts constitute materially adverse employment actions.[11]  Notwithstanding, the Court will address the issue as the significance of any purported act of retaliation depends upon the particular circumstances, meaning context matters.  *Id.* at 69.  For example, "reassignment of job duties is not automatically actionable" since the determination as to "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  *Id.* at 71 (citation and internal quotation omitted).  Thatcher fails to provide context as to why any of the purportedly retaliatory acts

---

[11]  The VA also omits any argument regarding whether the acts constitute materially adverse employment actions.  Since the burden remains on Thatcher to demonstrate her *prima facie* case, however, such omission is immaterial, especially given Thatcher's lack of argument or legal authority on the issue.

might have dissuaded a reasonable employee from making or supporting a charge of discrimination.

Most notably, Thatcher fails to demonstrate how the act of September 20, 2013 constitutes a materially adverse employment action (*see* Thatcher Dep., at 39, 53-62).  Thatcher describes the event as follows:

> On September 19, 2013, I initially contacted the Department of Veteran's [*sic*] Affairs Office of Resolution Management (hereinafter ORM) regarding my claims **(ORM Investigative File @ 00060)**.  On September 20, 2013, one of my former coworkers Beth Dorn, told me that Dr. Williams had asked her to write a report of conduct on me about "inappropriate conduct."  Ms. Dorn refused to do so, stating she never saw me out of line due to taking prescription medicine.  Ms. Dorn also stated she believed Dr. Williams was out to get me **(ORM Investigative File @ 00714)**.  I believe this retaliation was based upon my medical condition after returning to work from my back surgery, requesting reasonable accommodation and contacting the ORM regarding my claims.

(Doc. 41, Ex. L, at 8-9).  Joanne Dorn ("Dorn") provided an affidavit, dated April 13, 2019, in which she describes the event in the following manner:

> On another occasion, while I was working at the Largo Annex, Devon (the SW who was running the home[-]based care) asked me to write a Report of Contact on Tracy.  She said it was at the request of Dr. Williams and that it was due to reports that Tracy had been impaired at work and was suffering adverse effects of pain medication.

(Doc. 61, Ex. 32, at ¶11).  Notably, an ORM Report of Contact on July 7, 2014 indicates that Dorn previously described the event in the following terms:

> Ms. Dorn stated while working at VA facility in Largo, FL, management (unsure if Dr. Williams or another management official) told her to write a report of contact on the complainant on her inappropriate conduct and she refused to because she did not witness this impaired behavior.  She does not recall ever seeing the complainant out of line due to her taking her prescription medicine.  She personally thinks and believes that Dr. Williams was out to get the complainant on a personal vendetta; however, she did not have objective evidence to support this claim.

(Doc. 61, Ex. 15).

An employment action can be considered "adverse" only if it results in a tangible, negative effect on the plaintiff's employment. *Lucas*, 257 F.3d at 1261. Here, Thatcher failed to demonstrate that she suffered any tangible, negative effect on her employment as a result of the events of September 20, 2013, as the only thing that occurred that day involved a request to a third party, *i.e.* Dorn, to write up Thatcher, which Dorn refused (Thatcher Dep., at 39, 53-62; Doc. 41, Ex. L, at 8-9; Doc. 61, Ex. 15). The September 20, 2013 request therefore did not result in any effect on Thatcher's employment, much less a tangible, negative effect. *See, generally, Lucas*, 257 F.3d at 1261 (noting that negative performance evaluations did not result in any effect on the plaintiff's employment as the employer did not rely on the evaluations to make any employment decisions regarding the plaintiff). Even if Dorn decided to issue a negative report relating to Thatcher's performance, which she did not do, "[n]egative performance evaluations, standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation." *Id.* (citation and footnote omitted). Given the lack of any tangible, negative effect on Thatcher's employment from the act of September 20, 2013, Thatcher failed to satisfy the second element of the *prima facie* case as to that act, and her retaliation claim fails on that basis.[12] Summary judgment is therefore warranted as to Thatcher's retaliation claim relating to the act of September 20, 2013.

Indeed, the other four allegedly retaliatory acts could fail on that basis as well, since Thatcher failed to demonstrate that any of the acts constitute materially adverse employment actions. Even assuming that Thatcher could satisfy the second element of her *prima facie* case,

---

[12] Furthermore, as the VA argues, Thatcher failed to demonstrate that her protected activity constituted the but-for cause of the act of September 20, 2013. Namely, during her deposition, Thatcher indicated that the act of September 20, 2013 stemmed from a long history of perceived mistreatment or even a "vendetta" by Dr. Williams against her, the beginning of which preceded any of Thatcher's protected activity by several years (Thatcher Dep., at 12-14, 16-18, 27-28, 30-32, 53-59, 91, 146-48; 2019 Williams Dep., at 16-22; Doc. 41, Ex. D & KK, at 23-24, 61-64; *see* Doc. 61, Ex. 15, 29-34).

however, Thatcher cannot satisfy the third element, as she failed to establish but-for causation for the purportedly retaliatory acts.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *Frazier-White*, 818 F.3d at 1258 ("The third element requires a showing of but-for causation.").  Moreover, even if Thatcher could establish the third element of her *prima facie* case, the VA proffered legitimate, non-retaliatory reasons for its actions, while Thatcher failed to offer any argument or legal authority rebutting the VA's reasons or demonstrating that the VA's proffered reasons constitute pretext for retaliation.

As an initial matter, two of the acts Thatcher identifies as retaliatory occurred *prior to* Thatcher engaging in any protected activity.  Namely, the events of August 16, 2013, regarding Dr. Williams informing Thatcher of the charge of misconduct and reassignment, and of August 20, 2013, involving the filing of the police report by Dr. Krygowski, cannot provide a basis for Thatcher's retaliation claim as they occurred prior to Thatcher's initial request for a reasonable accommodation on August 26, 2013 and contact with an EEO counselor on September 9, 2013. Thatcher's subsequent protected activity could not constitute the but-for cause, and, thus, no causal link exists between Thatcher's protected activity and the acts occurring on August 16, 2013 and August 20, 2013.  *See Debose v. USF Bd. of Tr.*, Nos. 18-14637; 19-10865, 2020 WL 1983182, at * 3 (11th Cir. Apr. 27, 2020) (finding that the failure to promote could not be considered retaliatory when the protected activity occurred subsequent to the plaintiff learning of the promotion of her coworker); *Gooden*, 679 F. App'x at 968 ("The alleged physical harassment was not retaliatory because it occurred *before* Ms. Gooden engaged in protected activity") (emphasis in original); *Palmer*, 624 F. App'x at 703 ("Indeed, his allegation that that his cases were reviewed more often than was required by procedure does not show a materially adverse employment action—since it apparently resulted in no action at all—and moreover, is

not causally related to his EEOC complaint—since it began in December 2011, before he filed his EEOC complaint."). Summary judgment is likewise warranted as to Thatcher's retaliation claim relating to the acts of August 16, 2013 and August 20, 2013. Accordingly, only the acts occurring on September 15, 2013 and October 23, 2013 can serve as potential bases for Thatcher's retaliation claims.

As to the failure to return Thatcher from the Largo office at the conclusion of the fact finding on September 15, 2013, Thatcher failed to demonstrate that her protected activity constituted the but-for cause of that decision or in any way related to the decision. Indeed, as the VA contends, Thatcher offered several other reasons regarding why Dr. Williams would allegedly retaliate against her, including, among other things, Dr. Williams's long-standing vendetta against her, her knowledge about alleged improprieties with the Hospice Unit and Medicare fraud, and the mistreatment of veterans (Thatcher Dep., at 12-14, 16-18, 27-28, 30-31, 53-59, 91, 146-48; 2019 Williams Dep., at 16-22; Doc. 41, Ex. D & KK, at 23-24, 62-64; *see* Doc. 61, Ex. 15, 29-34). Notwithstanding, the VA indicated that its legitimate business reason for not returning Thatcher from the Largo office after the conclusion of the fact finding was that the VA's standard practice is to keep someone detailed until the disciplinary process concludes (*see* Doc. 41, Ex. J; 2019 Williams Dep., at 86-87, 101-04; 2014 Williams Dep., at 79-80; Thuriere Dep., at 17-20). Indeed, Dr. Williams's August 16, 2013 memo to Thatcher, which occurred prior to any protected activity, indicated that he received concerns regarding possible misconduct and, as a result, a decision was made to temporarily reassign Thatcher to the Geriatrics Office in Largo, effective immediately, "pending the outcome of an investigation, and any subsequent administrative action" (Doc. 41, Ex. J). When Dr. Williams inquired as to whether he could move Thatcher back from the Largo office, HR indicated that Thatcher could not be moved until completion of the disciplinary process (2019 Williams Dep., at 86-87, 102;

2014 Williams Dep., at 79-80).  According to Dr. Williams, once the fact finding concluded, HR had to formulate a disciplinary action plan for Thatcher, which never occurred (2019 Williams Dep., at 86-87, 101-02).  Upon inquiry by Dr. Williams, HR indicated that the disciplinary process pertaining to Thatcher was put on hold as a result of Thatcher's pending disability retirement request (2019 Williams Dep., at 86-87, 102; Thuriere Dep., at 66-67).

Given the legitimate, non-retaliatory reason for the decision, the burden shifts to Thatcher to demonstrate that the VA's proffered reason constitutes pretext for retaliation. Importantly, Thatcher "cannot establish pretext by simply demonstrating facts that suggest retaliatory animus, but must specifically respond to each of the employer's explanations and rebut them." *Burgos-Stefanelli*, 410 F. App'x at 247 (citing *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1309 (11th Cir. 2007)).  Thatcher devotes nearly her entire response to a recitation of facts that she contends constitutes "sufficient evidence that [Thatcher] was not returned to Bay Pines at the end of the Fact Finding because Dr. Williams had learned of her EEO claims" (Doc. 61, at 19).  Notably missing from her response, however, is any attempt to meet the VA's reason "head on and rebut it."  *See Burgos-Stefanelli*, 410 F. App'x at 247. Rather, she relies on speculation and conjecture regarding the reason for this decision and for the other allegedly retaliatory acts, which is insufficient to survive summary judgment.[13] *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018) (citation omitted) (finding that the district court did not err in granting summary judgment on the plaintiff's Equal Pay Act retaliation claims where the plaintiff offered no evidence in support of her speculative assertion regarding the reason for the defendant's decision under the burden-shifting framework); *cf.*

---

[13] Thatcher relies upon several affidavits in which the affiants allege a "conspiracy" or attempts to "oust," "railroad," "get rid of," and "shut down" Thatcher based on speculation and conjecture or solely based on statements made to them by Thatcher (Doc. 61, Ex. 29-34).

*Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted) (indicating that a party does not meet its burden of producing a defense to a summary judgment motion by offering unsupported speculation).  Nothing in the record indicates that the VA deviated from its standard practices when considering whether to return Thatcher from the Largo office following the conclusion of the fact finding, however.[14]  Thatcher does not point to any evidence of record demonstrating that the VA's standard practices regarding concluding disciplinary processes and putting such processes on hold during the pendency of disability retirement requests constituted pretext for retaliation.  Accordingly, Thatcher's claim of retaliation based upon the failure to return Thatcher from the Largo office at the conclusion of the fact finding on September 15, 2013 does not survive summary judgment.  *Burgos-Stefanelli*, 410 F. App'x at 247 (affirming the district court's grant of summary judgment on the plaintiff's retaliation claim under the Rehabilitation Act where the plaintiff failed to produce any evidence to show that the reason for the employer's decision constituted pretext).

With respect to the October 23, 2013 memo, Thatcher's retaliation claim likewise does not survive summary judgment on that basis.  Following the fact finding, a report was issued indicating, in pertinent part:

> I also found consistent evidence that Ms. Thatcher approaches problems and concerns in the workplace in a manner that is perceived by others as rude, bullying, defiant, and hostile.

---

[14]  Thatcher offers the affidavit of Christy Galbreath, a retired RN who supervised Thatcher at the Bay Pines VA from 2002 to 2011 (Doc. 61, Ex. 33, Affidavit of Christy Galbreath ("Galbreath Aff."), at ¶¶1, 2, 4).  According to Galbreath, she had "never been aware of a fact finding where an employee was transferred out of the job but then never returned at the conclusion of the fact finding unless they were terminated or their job was changed" (Galbreath Aff., at ¶16).  Galbreath's statement does not create a genuine issue of material fact, as her lack of knowledge of a similar incident does not lead to the conclusion that the VA failed to follow its standard practices in this instance, especially against the backdrop of the statements from Dr. Williams, Dr. Thuriere, and HR representatives regarding the process and the basis for the decisions made with respect to Thatcher.  Galbreath offers no firsthand knowledge of the events that transpired following the fact finding nor acted in a supervisory role in that process.  Accordingly, her statement does nothing to further Thatcher's position.

Ms. Thatcher is in violation of the Bay Pines VAHCS Center Memorandum 516-12-05-053 Codes of Conduct, Attachment B Disruptive Behavior:
Section 4: Bullying or demeaning behavior
Section 5: Abusive treatment of patients or staff
Section 11: Uncooperative or defiant approach to problems
Section 15: Physical touching, pinching, patting the gluteus or other area of the body, slapping or unwanted touch
Section 19: Pattern of hostility toward a staff person or employee
Section 20: Abusive behavior which can be construed by a pattern of malcontent and frequent outbursts of anger
Section 37: Rude behavior towards patients, employees or visitors at the Bay Pines VA Healthcare System.

Ms. Thatcher is in violation of VA Regulation 38 CFR 0.735-12(b), which states "Employees will furnish information and testify freely and honestly...refusal to testify, concealment of material facts, or willfully inaccurate testimony in connection with an investigation or hearing may be ground for disciplinary action." Ms. Thatcher failed to provide accurate testimony in connection with this investigation.

**Items deferred to GEC Service Chief for follow up:** Other allegations that came to light during this investigation include unethical behavior, bullying and a hostile work environment. There is also a concern among staff and leadership about the mental stability of Ms. Thatcher. These allegations and concerns are identified in the various reports of contact received as a part of the evidence file for the current investigation. These issues were not investigated as a part of this fact-finding and are referred to the Service Chief, Dr. L. Williams for investigation.

(Doc. 41, Ex. DD, at 6-7). Given Dr. Williams's recusal from the fact finding, the findings and conclusions were deferred to Dr. Thuriere as Chief of Staff (Doc. 41, Ex. F & EE; Thuriere Dep., at 64). Upon receipt, Dr. Thuriere indicated that she would discuss the findings and conclusions with HR and would consider a fitness for duty exam (Doc. 41, Ex. EE; Thuriere Dep., at 64-65). Subsequently, under the direction of Dr. Thuriere, Dr. Williams submitted a request for a fitness for duty examination to HR, requesting a fitness for duty examination for Thatcher based upon the fact finding (Doc. 41, Ex. FF; 2019 Williams Dep., at 93-94). Accordingly, on October 23, 2013, HR issued the memo to Thatcher directing her to attend a fitness for duty examination (Doc. 41, Ex. GG).

46

The record indicates that the fact finding, which directly led to the October 23, 2013 memo, began before Thatcher engaged in any protected activity, as evidenced by notes from an interview conducted of Dr. Krygowski on August 22, 2013, which were included in the findings and conclusions from the fact finding (Doc. 41, Ex. DD).  In fact, all of the interviews taken in conjunction with the fact finding occurred before Thatcher's initial EEO activity on September 9, 2013 (*see* Doc. 41, Ex. O & DD).  As noted above, Thatcher makes no effort to demonstrate that her protected activity played any part in the issuance of the October 23, 2013 memo, and, given this backdrop, she likely could not.

Irrespective, the VA proffered a legitimate, non-retaliatory reason for the October 23, 2013 memo.  Namely, the fact finding revealed several violations of the Code of Conduct and a violation of a VA regulation by Thatcher, which led to the referral to Dr. Thuriere, the subsequent referral to Dr. Williams, and the final referral to HR, who issued the memo to Thatcher.  As the October 23, 2013 memo aptly indicated, Thatcher needed to submit to a fitness for duty examination as a result of "inappropriate behavior and questionable conduct," the details of which appeared in the fact-finding report (Doc. 41, Ex. DD & GG).

Given the legitimate, non-retaliatory reason for the October 23, 2013 memo, the burden shifts to Thatcher to show that the VA's reason constituted pretext for retaliation.  Thatcher again makes no effort to meet the VA's reason head on and rebut it, and Thatcher thus fails to demonstrate that the memo from HR directing her to attend a fitness for duty examination constituted pretext for retaliation.  Accordingly, Thatcher's claim of retaliation based upon the October 23, 2013 memo does not survive summary judgment.  *See Burgos-Stefanelli*, 410 F. App'x at 247 (affirming the district court's grant of summary judgment on the plaintiff's retaliation claim under the Rehabilitation Act where the plaintiff failed to produce any evidence to show that the reason for its decision constituted pretext).  As she cannot establish a basis for

a retaliation claim relating to any of the enumerated acts by the VA, summary judgment is granted on Count III.

**IV.     Conclusion**

After consideration, and for the foregoing reasons, it is hereby

ORDERED:

1.  The VA's Motion for Summary Judgment (Doc. 41) is GRANTED.

2.  The Clerk is directed to enter final judgment in favor of the VA and against Thatcher.

3.  The Clerk is further directed to terminate all deadlines and close the case.

DONE AND ORDERED in Tampa, Florida, on this 1st day of June, 2020.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge

cc:      Counsel of Record